UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

KRISTINA K.[1],                                    )
                                                   )
           Plaintiff,                              )
                                                   )
    v.                                             )      CIVIL NO. 1:21cv326
                                                   )
KILOLO  KIJAKAZI, Acting                           )
Commissioner of Social Security,                   )
                                                   )
           Defendant.                              )

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for Disability

Insurance Benefits (DIB) under Title II of the Social Security Act, and Supplemental Security

Income (SSI) under Title XVI of the Act.. Section 205(g) of the Act provides, inter alia, "[a]s

part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record

including the evidence upon which the findings and decision complained of are based.  The court

shall have the power to enter, upon the pleadings and transcript of the record, a judgment

affirming, modifying, or reversing the decision of the [Commissioner], with or without

remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to

any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).


The law provides that an applicant for disability benefits must establish an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to last for a continuous period of no less than 12

───────────────

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment

is "an impairment that results from anatomical, physiological, or psychological abnormalities

which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."

42 U.S.C. §423(d)(3).  It is not enough for a plaintiff to establish that an impairment exists.  It

must be shown that the impairment is severe enough to preclude the plaintiff from engaging in

substantial gainful activity.  *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372

U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979).  It is well established that

the burden of proving entitlement to disability insurance benefits is on the plaintiff.  *See Jeralds*

*v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record

as a whole contains substantial evidence to support the [Commissioner's] findings."  *Garfield v.*

*Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786

(7th Cir. 1982); 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a mere

scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting

*Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*,

552 F.2d 781, 784 (7th Cir. 1977).  "If the record contains such support [it] must [be] affirmed,

42 U.S.C. §405(g), unless there has been an error of law."  *Garfield*, *supra* at 607; *see also*

*Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after a hearing, the Administrative Law Judge ("ALJ") made the

following findings:

1.      The claimant meets the insured status requirements of the Social Security Act

2

through June 30, 2024.

2.      The claimant has not engaged in substantial gainful activity since September 22, 2018, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.      The claimant has the following severe impairments: History of Duane's syndrome and Irlen's syndrome; history back pain with sacroiliac joint degenerative joint disease, lumbar degenerative disc disease with spondylosis, and osteoarthritis; and history of mood disorder, bipolar disorder, depressive disorder, anxiety and social phobia disorder, posttraumatic stress disorder (PTSD), attention deficit hyperactivity disorder (ADHD), and borderline personality disorder (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform "light" work as defined in 20 CFR 404.1567(b) and 416.967(b) subject to the following additional limitations: The claimant is able to climb of [sic] ramps and stairs, balance, stoop, kneel, crouch, and crawl on an occasional basis. She should never climb ladders, ropes, or scaffolds. She needs to avoid concentrated exposure to wetness, loud noise, vibrations, and bright or flashing lights. She must work in an indoor environment. She should not work with computers or look at computer screens. She should avoid all exposure to hazards, including operational control of dangerous moving machinery; unprotected heights; slippery, uneven or moving surfaces; and use of moving vehicles. With respect to mental impairments, she is limited to understanding, carrying out and remembering simple instructions consistent with unskilled work (defined as occupations that can be fully learned within a short of time of no more than 30 days, and requires little or no judgment to perform simple tasks), with the ability to sustain those tasks throughout an eight hour workday without frequent redirection to task. She should not work in an environment that is stringently production or quota based, and thus may not perform fast-paced assembly-line type of work, but she is able to meet production requirements that allow her to sustain a flexible and goal oriented pace. The ability to use judgment in making work-related decisions is limited to making only simple work-related decisions. She must work in a stable setting where there are no sudden or unpredictable workplace changes in terms of use of work tools, work processes, or work settings and if there are workplace changes, they are introduced gradually. She is able to tolerate only superficial interactions with supervisors, coworkers, and the general public, defined as occasionally [sic]

casual contact with no prolonged conversations, and contact with supervisors is short but allows the supervisors to give instructions. She should be assigned no work with large groups of people. She is able to perform work which would only require, at most, occasional simple reading, writing, and math calculations due to vision difficulties.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on December 16, 1968 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from September 22, 2018, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-30).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits,

leading to the present appeal.

Plaintiff filed her opening brief on February 28, 2022.  On April 1, 2022 the defendant

filed a memorandum in support of the Commissioner's decision to which Plaintiff replied on

May 4, 2022. Upon full review of the record in this cause, this court is of the view that the

Commissioner's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled.  *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987).  The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order:  (1)  Is the claimant presently unemployed?  (2)  Is the claimant's impairment "severe"? (3)  Does the impairment meet or exceed one of a list of specific impairments?  (4)  Is the claimant unable to perform his or her former occupation?  (5)  Is the claimant unable to perform any other work within the economy?  An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).   In the present case, Step 5 was the determinative inquiry.

Plaintiff alleges that she suffers from bipolar disorder, mood disorder, PTSD, severe major depressive disorder with psychotic features, anxiety, ADHD, Duane's Retraction syndrome, diplopia (double vision), flickers of lights on computer screens and in different lighting situations, myopia (nearsightedness), hypermetropia. (farsightedness), astigmatism, lumbar spondylolysis, SI joint arthritis, degenerative joint disease at the pubic symphysis, lumbar spine degenerative joint disease, sacroiliac pain, hypoglycemia, and Irlen syndrome.

In support of remand, Plaintiff first argues that the ALJ did not properly analyze her mental health limitations. The record shows that in June 2011 Plaintiff was admitted inpatient at

Parkview Behavioral Health after calling the police because she wanted to "shoot herself." (Tr. 572). At that time Plaintiff was on Celexa and BuSpar, which was prescribed by a family physician in Colorado. *Id*. At Parkview Behavioral Health, Dr. Gladys Beale found that Plaintiff was poorly groomed, had psychomotor agitation and rapid pressured speech. (Tr. 74.) Judgment, insight, impulse, and control were all noted as "poor." *Id*. Dr. Beale additionally noted, "Her thought form is circumstantial, her mood is expansive and dysphoric. She is anxious. Her thought content is remarkable for hopeless, helpless feelings and low self-esteem. She has suicidal ideations." *Id*. Dr. Beale also noted that she met with Plaintiff's mother and aunt and that they, "gave a history of chaotic mood swings and out-of-control behavior. The patient had just taken off before they could hospitalize her." *Id*.

In January of 2012 Park Center notes state, "client is actively participating and showing limited progress." (Tr. 547). In January of 2013 Park Center notes state that Plaintiff is again having suicidal ideation. (Tr. 980). In October of 2013 Park Center noted that "client limitations" included, "Problems with relationships interfere with functioning in other life domains." (Tr. 987). In 2016 Plaintiff was prescribed Zoloft by Health West Community Health Center. (Tr. 588). At a January 2019 Parkview office visit Plaintiff was assessed with anxiety, PTSD, and bipolar disorder, additionally noting, "severe episode of major depressive disorder with psychotic features." (Tr. 781).

Upon discharge from the weeklong inpatient hospital stay at Parkview Behavioral Health, Dr. Beale gave Plaintiff a GAF score of 50, indicating severe impairment. (Tr. 571).

Plaintiff points out that the ALJ did not mention her GAF score at all. The Seventh Circuit has stated that though low GAF scores alone are insufficient to overturn an ALJ's decision, GAF

6

scores in context can reveal an ALJ's "deficient consideration of entirety of claimant's evidence." *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014). In *Yurt*, the court found, "Although the Commissioner is correct that the ALJ was not required to give any weight to individual GAF scores, *see Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010), the problem here is not the failure to individually weigh the low GAF scores but a larger general tendency to ignore or discount evidence favorable to Yurt's claim, which included GAF scores from multiple physicians suggesting a far lower level of functioning than that captured by the ALJ's hypothetical and mental RFC." *Yurt*, 758 F.3d at 860.

Ms. Holly Worrick, who holds a Masters in Social Work, did an evaluation of Plaintiff for vocational rehabilitation purposes. (Tr. 602-05). Ms. Worrick stated:

> Due to TBI, borderline personality and PTSD, [Plaintiff] has a substantial impediment to interpersonal interactions. Specifically, when getting an NVE for her TBI, her previous VR counselor noted she had problems with her employers and coworkers, which was a contributing reason for the need to reapply for VR services. Her NVE noted persistent emotional and behavioral dysregulation. She reported that she does not have patience for people, and exhibited irritability and agitation per her IDEC assessment. Due to TBI, borderline personality and PTSD, [Plaintiff] cannot: -Prepare for and succeed in work due to social withdrawal, poor relationships, inappropriate behaviors, and/or frequent conflict with peers, co-workers, supervisors and others - due to agitation and lack of patience.

(Tr. 603).

Ms. Worrick additionally stated, "[Plaintiff] has substantial difficulty with stamina and feeling overwhelmed. She will need follow-up services to ensure she is able to maintain employment." (Tr. 605). Ms. Worrick further opined, "Due to intellectual, sensory, and mental health disabilities, [Plaintiff] is unable to perform at a pace necessary to meet minimum production or job standards, is unable to sustain productivity and/or experiences significant

decline in quality of work over the course of the work shift due to limited endurance." (Tr. 604).

The ALJ disregarded Ms. Worrick's evaluation stating, "Ms. Worrick seems to have taken all of the claimant's subjective complaints and blended them into one, basically indicating that due to the combination of her conditions, there would be no work she could be trained to do." (Tr. 25). The ALJ further stated that Ms. Worrick appeared to have taken Plaintiff's complaints as true without having "substantiation from medical records." *Id*. However, this is clearly incorrect as Ms. Worrick prefaces each opinion with a "Source," primarily citing Park Center records when discussing Plaintiff's mental health diagnosis and limitations. *Id*. at 602-05. Additionally, as noted in the above statement from Ms. Worrick, Plaintiff's previous Vocational Rehab Counselor noted feedback from employers, as well as previous assessments. The ALJ does not discuss these citations or third-party references upon which Ms. Worrick based her evaluation. Rather, the ALJ incorrectly stated that Ms. Worrick based her opinion on Plaintiff's "subjective complaints." Tr. 25).

Dr. Boen, a state agency psychologist, performed two evaluations of Plaintiff, one in 2019 and one in 2020. (Tr. 901, 1009). With respect to the 2020 evaluation, the ALJ states, "The mental status examination documented normal findings other than kinesthetic hallucinations, paranoid and suicidal ideation, and mildly below normal judgment." (Tr. 26). The ALJ also stated that Dr. Boen opined that Plaintiff would have trouble getting along with co-workers. *Id*. The ALJ stated that Dr. Boen did not elaborate or give supportive comments on the limitations, and it was therefore not fully persuasive. *Id*. The ALJ downplays "hallucinations, paranoid and suicidal ideation" on the premise that Dr. Boen did not elaborate or give supportive comments, however Dr. Boen's opinion is supported by the January 2019 Parkview office visit which noted "severe

episode of major depressive disorder with psychotic features." (Tr. 781). Additionally, Dr. Boen's assessment is supported by Plaintiff's 2011 inpatient hospital stay. (Tr. 572). Therefore, Dr. Boen's opinion should have been given more weight as it is consistent with other medical sources in the record.

At the hearing, Plaintiff testified that when she was 20 she was diagnosed with schizophrenia, but they later changed it to multiple personality disorder. (Tr. 86). She stated that she has a lot of anxiety, but she has found that if she stays anxious it's more motivating than the depression, where she cries all the time and has difficulty breathing. (Tr. 89). She further stated that she prefers to stay in an anxious state versus a depressed state because she has been suicidal off and on most of her life, and her brother died from suicide. *Id.* Plaintiff testified that she wears ear molds or cotton in her ears when she leaves the house because too much noise makes her crazy and causes stress and anxiety. (Tr. 85). She also described "out of body experiences" she has had over the years, and has started wearing long sleeves and hats when she is around fluorescent lights believing that she needs to "keep the lights away from her body." (Tr. 77, 100). She stated she no longer takes medications because she cannot keep track of all of them, and that she goes to counseling because there is a licensed counselor in the building next to hers. (Tr. 88). Plaintiff has a dog that was officially prescribed as an emotional support animal. (Tr. 108). At the hearing Plaintiff testified that people "make life harder," and that she cannot get along with the people at her church. (Tr. 91). In a third-party function report, Plaintiff's brother similarly stated that Plaintiff has difficulty with relationships. (Tr. 414).

The ALJ regularly refers to "a general lack of mental health treatment records in recent years" as support for Plaintiff's alleged mental limitations being inconsistent with the evidence.

(Tr. 24-25). However, "Mental illness in general and bipolar disorder in particular ... may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F. 3d 627, 630 (7th Cir. 2006). The fact that there are gaps in Plaintiff's treatment is not evidence that her mental limitations are somehow less severe. Additionally, Plaintiff has mental health records from 2011-2014, 2016, and 2019. (Tr. 571, 980, 585, 588, 859, 861, 866, 987). The ALJ fails to discuss Plaintiff's 2011 inpatient mental health stay and her GAF score, both of which support her claim of disability, and are supported and consistent with the full record as discussed above. Furthermore, the ALJ finds Ms. Worrick's assessment as not persuasive stating that it is based on Plaintiff's "subjective complaints," but fails to acknowledge that Ms. Worrick cites the many sources upon which she based her opinion, and that Ms. Worrisk's assessment is also consistent with the medical record and testimony. Additionally, the ALJ fails to give weight to Dr. Boen's assessment which noted hallucinations and paranoid suicidal ideations because it was not "elaborated with supportive comments;" however, Dr. Boen's assessment is supported by a 2019 Parkview record as well as Plaintiff's inpatient mental health stay in 2011, neither of which the ALJ discusses. For all of these reasons, remand is required for a proper evaluation of Plaintiff's mental health limitations.

Next, Plaintiff argues that the ALJ erred in evaluating her vision impairments. Plaintiff suffers from Duane's Retraction Syndrome and Irlen's syndrome. (Tr. 18). Plaintiff testified that she has a problem with certain wavelengths of light, and that she has difficulty with fluorescent and LED lights. (Tr. 77). She stated she only listens to the TV and is unable to watch because it is "too flashy." (Tr. 74). She testified that she cannot see to the left, and has a blind spot there. (Tr. 98). She further testified that patterns such as ones on carpets are "alive" in her world, and that

they move around and "wiggle." (Tr. 100). Plaintiff stated that she is unable to see straight and to the left and has to move her head and neck in order to see. (Tr. 49).

In April 2015, Plaintiff's optometrist, Dr. Windsor, stated that Plaintiff has vision loss "secondary to Duane's Retraction Syndrome." (Tr. 597). Dr. Windsor continued, "This is a rare, congenital disorder characterized by the inability to turn outward (abduct). If she looks quickly to the side she will see double. She complains of intermittent diplopia that is causing disruption in everyday living. She has a lack of depth perception and an uneasiness when walking on steps or stairs. She complains of significant light and glare at distance and near." *Id*. In November of 2015 Dr. Windsor noted, "Diplopia in intermittent on gaze and straight ahead and lack of ocular depth perception." (Tr. 596).

In September 2016, optometrist Dr. Michael Flandro stated, "testing showed a few scattered visual field defects in both eyes…We found she turns her head to the left and tilts her head down to compensate secondary to Duane Syndrome. She lacks depth perception. Her diplopia is intermittent on gaze and straight ahead…Vision to the left eye retracts into the orbit and an estropia is created. She has a lack of abduction of moving out of the left eye." (Tr. 577). Dr. Flandro further stated, "She is not legally blind, but double vision is a significant impairment." (Tr. 578).

In May 2019 Dr. Windsor noted, "Diplopia straight ahead at a distance. Flickers of lights on computer screens and in different lighting situations. Left hemi field has diplopia through the distance. Reporting head and neck trouble from the angle of the head tilt. Plan: Diplopia in intermittent on gaze and strait ahead and lack of ocular depth perception." (Tr. 676). Dr. Windsor further noted, "The muscles of the eye try to turn but instead pull the eye backward…[Plaintiff]

11

must turn her head to compensate for the movement limitation of her left eye which results in intermittent double vision or diplopia. The intermittent diplopia can be very disruptive to her functioning." (Tr. 678).

Plaintiff does not drive at night due to light sensitivity with oncoming headlights. (Tr. 562). It was noted in the record that she still meets the requirements for a driver's license but a "provision mirror" was recommended when driving. (Tr. 682). It was additionally noted, "She should be a much safer driver with the implementation of the occluded amber fitover for driving," due to [Plaintiff's] double vision. (Tr. 564).

Dr. Windsor has noted problems with Plaintiff's neck and lower back from "head and body positioning to help the diplopia (double vision)."  (Tr. 615). The State agency consultative physician, Dr. Giffen, noted that, due to Irlen syndrome, certain wavelengths cause palpitations and head pain. (Tr. 1002).

In his decision, the ALJ states that the limitation of light work eliminates work that would aggravate Plaintiff's vision problems. (Tr. 24). The ALJ further states that Plaintiff "continues to report double vision and light sensitivity, so various restrictions are adopted here to address her complaints, such as avoidance of hazards, no computer work, no driving, no bright or flashing lights, and reduced reading, writing and math calculations to avoid triggers." *Id*. Based on the Vocational Expert (VE) testimony, the ALJ identified three jobs Plaintiff is allegedly capable of performing: Assembler of Plastic Products, Assembler of Electrical Accessories, and Cafeteria Attendant. (Tr. 30).  Plaintiff notes that the job of assembler of plastic products requires occasional color vision, frequent depth perception, and frequent near acuity, and that the job of assembler of electrical accessories requires frequent near acuity, frequent depth perception, and

occasional color vision. Additionally, Plaintiff notes that the job of cafeteria attendant requires occasional talking and occasional near acuity.

Dr. Windsor noted in May of 2019 that Plaintiff had a "lack of ocular depth perception." (Tr. 676). Dr. Flandro, also noted lack of depth perception in September of 2016. (Tr. 577). The ALJ did not acknowledge these opinions, and found Plaintiff capable of performing jobs that require "frequent depth perception." Plaintiff's vision limitations are consistent with the limitations outlined by Dr. Windsor and Dr. Flandro, yet the jobs identified that Plaintiff allegedly would be capable of performing require "visual inspection of product defects" and "verification of assembly to picture drawings." Regular double vision, lack of depth perception, scattered visual field defects, and inability to look to the left would be a problem in all positions identified. The ALJ only addressed Plaintiff's light sensitivity and double vision, without addressing the issues with looking to the left or depth perception. (Tr. 24). The ALJ failed to build a logical bridge from evidence to conclusion when finding Plaintiff capable of performing the above jobs. Thus, remand is warranted.  Additionally, on remand, the ALJ must fully consider the impact of Plaintiff's combined impairments on her ability to sustain regular, full-time employment.

<u>Conclusion</u>

On the basis of the foregoing, the Decision of the Commissioner is hereby REVERSED

AND REMANDED for further proceedings consistent with this Opinion.

Entered: May 17, 2022.

s/ William C.  Lee
William C. Lee, Judge
United States District Court